FILED

2010 Jun-21  AM 10:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| BETTY BRYANT, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:09-cv-415-JHH |
| UNITED STATES STEEL CORPORATION, | ) | |
| | ) | |
| DEFENDANT. | | |

## MEMORANDUM OF DECISION

The court has before it the March 25, 2010 motion (doc. # 25) of Defendant United States Steel Corporation ("USS")  for summary judgment.  Pursuant to the court's March 29, 2010 order (doc. # 28), the motion was deemed submitted, without oral argument, on April 26, 2010.  The motion is due to be granted in full for the following reasons.

## I. Procedural History

Plaintiff Betty Bryant, a white female, commenced this action on March 2, 2009 by filing a complaint in this court alleging sex, race and disability discrimination, sexual harassment and retaliation because of her sex and race.  More specifically, Plaintiff's Complaint contains the following five counts: (1) Count I

alleges sex discrimination in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e et. seq, claiming that (a) she was discharged because

of her sex, (b) that USS failed to accommodate her medical condition because of her

sex, and (c) that she was subjected to sexual harassment; (2) Count II alleges

retaliation because of her sex and race in violation of Title VII regarding (a) a drug

test she was required to take, (b) her discharge, and (c) the refusal of USS to return

her to work; (3) Count III asserts the same retaliation claims because of her race in

violation of 42 U.S.C. § 1981; (4) Count IV alleges race discrimination in violation

of section 1981 in her (a) discharge and in (b) USS's failure to accommodate her

medical condition; and (5) Count V alleges a violation of the American with

Disabilities Act ("ADA"), 42 U.S.C. § 12101, et. seq., in USS's refusal to return her

to work.   Defendant's  motion for summary judgment asserts that all of Plaintiff's

claims fail as a matter of law.

   Both parties have filed briefs and submitted evidence in support of their

respective positions.  Defendant submitted evidence[1] (doc. # 27) in support of its own

motion for summary judgment and filed a supporting brief (doc. #26) on March 25,

---

[1] The defendant submitted the following evidence: Bryant deposition with exhibits; declaration of Jodi Watson; declaration of Bernard Borman; 6/13/99 USS/USW Agreement; Bernard Borman deposition with exhibits; Dr. Cheryl Szabo deposition with exhibits; James Patrick Thomas III deposition with exhibits; Dr. Adrian Thurstin deposition with selected exhibits; Dr. Thurstin's assessment report and 3/9/10 letter; excerpts of USS discovery responses.

2010. On April 19, 2010, Plaintiff filed a brief (doc. #30) and evidence[2] (doc. #29) in opposition to Defendant's motion for summary judgment. On April 26,2010, Defendant filed a brief (doc. #31) in reply to Plaintiff's opposition,[3] and the motion was deemed submitted, without oral argument.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a

---

[2] The plaintiff submitted the following evidence: Step Two Notes; Union's Request for the Plaintiff to be put back to work; release of Dr. Prohaska's records; ADA policy; Illegal and Unethical Conduct policy; Organizational/Operational chart; Drug Testing policy; USS Medical Records re: Hearing loss; 9/18/2007 Drug Testing records; E-mail regarding selection of Thurstin; Thurstin's report; relevant sections of BLA; USS medical records regarding depression and anxiety; USS medical records regarding 11/03/2007 accident; deposition of Jodie Watson; declaration of Joseph Thomas; declaration of William Gunnin; declaration of Betty Bryant; USS interrogatory responses; declaration of William Jackson; grievance provisions of BLA.

[3] Defendant also filed a motion (doc. #32) to strike certain portions of Plaintiff's declaration which was submitted by Plaintiff in opposition to summary judgment. Plaintiff responded to the motion (doc. #37), and the court granted the motion in a separate order (doc. # 39) and denied a motion to reconsider. (Doc. #41).

genuine issue of material fact.  See Celotex Corp., 477 U.S. at 323.  After the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Prop., 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine

issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the

5

court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

Betty Bryant, a white female, began her employment with USS in 1997 at its Fairfield Works facility.  (Compl. ¶ 7; Bryant Dep. at 75.)  Plaintiff was employed as a Utility Technician in the Hot Strip Mill where she drove a slab hauler.  (Bryant Dep. at 29-30; Borman Dep. at 91.)  At all times relevant to this action, Bryant was a member of the United Steelworkers of America ("USW") and was represented by the USW.  (Bryant Dep. at 130.)  The terms of her employment were set forth in the May 20, 2003 Basic Labor Agreement ("BLA").  (Id.)  The BLA contains a grievance and

---

[4]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

arbitration procedure when an employee disagrees with disciplinary action.  (See Pl. Ex. U.)

### A.  2001 Positive Drug Test and 2003 PTSD Diagnosis

In early 2001, Bryant tested positive for marijuana following an accident at work.  (Bryant Dep. at 133; Ex. 3 to Bryant Dep.; Borman Decl. ¶ 1.)  As a result, Bryant was suspended from work for five (5) days and was subject to discharge.  (Id.; Borman Decl. ¶ 2.)  Bryant was allowed to return to work under a Last Chance Agreement ("LCA") that permitted USS to test her for drug and alcohol use at any time at the discretion of management, among other things.  (Bryant Dep. at 134; Ex. 4 to Bryant Dep.; Borman Decl. ¶ 3.)  Although there is some dispute as to how long the LCA was in place,[5] it is undisputed that Bryant successfully completed the LCA, but that she could still be drug tested for cause (Bryant Dep. at 139) or randomly under the USS/USW Local Agreement.  (See 06-13-99 USS/USW Agreement.)

In 2003, Bryant was nearly struck by a steel slab that fell from a crane.  (Bryant Dep. at 140-42.)  Bryant sought counseling after this incident and was diagnosed with Post Traumatic Stress Disorder ("PTSD") and Panic Disorder.  (Bryant Dep. at 139-40, 283-84; Ex. 3 to Thurstin Dep.)   Although USS maintains that "[n]o USS

---

[5] The evidence is not clear on this point --  the LCA lasted either one or two years.  (See Def. Ex. D) (typed wording states one (1) year but handwritten wording states two (2)).

decisionmakers knew Plaintiff had been diagnosed with PTSD (Borman Decl. ¶ 6),"

Bryant's personnel file contained a release for work from her doctor dated February

16, 2004, which states that "she is receiving ongoing treatment for her Post-traumatic

Stress Disorder and Panic Disorder" but that she "was showing steady improvements

in her anxiety symptoms." (Ex. 3 to Thurstin Dep.) Additionally, USS's medical

records relating to Bryant, dated in late May 2004, indicate that Bryant had a history

of depression and anxiety. (Pl. Ex. M.)

### B. Bryant's Participation in Other Employees' Litigation Against the USW and USS

#### 1. 2006 Union Election for Grievance Chairman

In 2006, Bryant became involved in an investigation within her local union

regarding the union election results for the position of Grievance Chairman. (Bryant

Dep. at 144-45.) Bryant testified in that investigation on behalf of William Jackson,

an African American co-worker, whom she believed rightfully won the election over

a white opponent. (Id. at 47-48, 50-52, 144-47, 175-78.) Although Bryant believes

that USS management knew of her involvement in the internal union investigation,

she does not have any evidence to support her belief.[6] (Id. at 158-60.) Bryant

---

[6] Although Bryant's opposition brief states that USS management knew of her
involvement in the union investigation, the evidence cited supports the fact that Coleman Kelly
knew of her involvement in the later litigation. (Jackson Decl. ¶ 4.)

8

testified, however, that Robbie Autry, the Union Grievance Chairman, Fred Gibson, the former Union Grievance Chairman, and Dan Wesson, who holds a USS-paid union safety position, told her that if she aligned herself with Jackson she would not get anywhere inside the Union and she would eventually be fired.  (Bryant Dep. at 147-50 152-53.)

On March 9, 2007, Jackson filed a complaint in the Northern District of Alabama against the USW stemming from the 2006 union election.  (See 2: 07-cv-461-JEO.)  Bryant testified by deposition in 2008 on behalf of Jackson.  (Bryant Dep. at 47-48, 64-65, 175-78.)  Coleman Kelly, the General Manager of USS, knew about her involvement in the lawsuit filed by Jackson.  (Jackson Decl. ¶ 4.)

### 2.  Dubose and Godwin Discrimination Lawsuits

In May and June 2007, two former USS employees, Lyndon Dubose and Martaniex Godwin, filed complaints alleging race discrimination against USS.  (Bryant Dep. at 172; 2:07-cv-862-VEH; 2:07-cv-1411-SLB.)   Bryant spoke with Godwin's attorney about being a witness in his case, and although she was allegedly listed on Godwin's witness list, she never provided any sort of testimony on Godwin's behalf.[7]  (Bryant Dep. at 156-57, 173, 281, 311.)  Similarly, Bryant never

---

[7] Although Bryant's opposition brief states that Bryant provided a "written statement" in Godwin's case, the evidence cited in support of that statement does not support it.  (See Bryant Dep. at 281; Ex. 19 to Borman Dep. at 210-11, 222-23.)

testified in a deposition or court proceeding on behalf of Dubose in his lawsuit, but she may have provided a sworn statement on his behalf.  (Id. at 173-74, 311.)  It is undisputed that Bryant's name was mentioned in the depositions in these cases, and Dubose testified that Bryant had given him evidence to support his case.  (Ex. 18 to Borman Dep. at 283-84 and Ex.19 to Borman Dep. at 210-11, 222-23.)

C.  *Union's Problems in 2007 with Dr. Cheryl Szabo*

In the fall of 2007, the local union began investigating complaints regarding Dr. Cheryl Szabo, USS Plant Medical Director, and asserted that she should be discharged for alleged malpractice and unethical behavior.  (Ex. 19 to Bryant Dep. at 1; Borman Decl. ¶ 7; Borman Dep. at 20-22, 58-59; Szabo Dep. at 60.)  The union filed the complaints with the company on behalf of union employees, both African American and white, who claimed they had received improper and/or unethical treatment from Dr. Szabo.  (Borman Decl. ¶ 8; Borman Dep. at 57-83, 94-96, 129; Exs. 2-9 to Borman Dep.)  The complaints consisted of summaries of employees' claims against Dr. Szabo, which were forwarded to USS management in Pittsburgh.  (Exs. 2-9 to Borman Dep.; Borman Dep. at 56-59.)  Bryant was not one of the employees who made a claim against Dr. Szabo.  (Bryant Dep. at 198, 296.)

USS investigated the claims and provided responses to each claim.  (Borman Dep. at 56-60; Exs. 2-9 to Borman Dep.)  Ultimately, USS determined that the

10

complaints were false.  (Borman Decl. ¶ 9; Borman Dep. at 22, 25, 57, 71, 123, 126, 129, 131.)  USS did not terminate any of the individuals who provided information in  support of the union's complaints regarding Dr. Szabo.  (Borman Decl. ¶ 10.)

   *D.  September 18, 2007 Drug Test*

   On September 18, 2007, Bryant was tested for drug use.  USS maintains that the reason for the drug test was because a female employee advised USS management that she saw Bryant existing a restroom that smelled of marijuana, and Borman had Bryant drug tested as a result.[8]  (Ex. 19 to Bryant Dep. at 2; Borman Decl. ¶ 11.) Bryant contests this reasoning, however, and highlights the fact that the documentation surrounding the drug test states that the test was "random."[9]  (Pl. Ex. I.)  Additionally, Bryant points out that a "fitness for duty drug test" would have required that Bryant return home after the test, (Bryant Dep. at 166), but that Bryant returned to work after the test.  (Id. at 165-67.)

---

[8] Dr. Szabo was not involved in the decision to have Bryant tested for drugs.  (Szabo Dep. at 90-93; Borman Decl. ¶ 13.)  Borman made the decision.  (Id.)

[9] Specifically, the authorization form contains the handwritten word "random" and the testing form, which asks the reason for the test, has a check in the "random" box.  (Pl. Ex. I.) The box marked reasonable suspicion is not checked.  (Id.)

11

An African American male security guard escorted Bryant to the plant's medical center[10] for the test during her 11:00 p.m. to 7:00 a.m. shift on September 18, 2007.  (Id. at 161, 286-87.)  When they arrived at the medical department, Bryant went into a closed-door bathroom to provide a urine sample, as is normally done when such tests are administered.  (Id. at 162, 289.)

The next morning, Bryant went to the medical department and complained to Dr. Szabo about the test.  (Id. at 165.)  Bryant was not upset that she was tested for drugs or that the security guard who escorted her to the test was African American; instead she was upset with the manner in which the test was conducted.  (Id. at 66-67; 162-64.)  She did not like that one male security guard was assigned to escort her to the medical department rather than a female guard or two male guards.  (Id.)  Bryant testified that her discomfort and anger with having one male guard escort her stems from the fact that she was raped when she was fifteen.  (Id. at 163; Compl. ¶ 26.) On October 17, 2007, Bryant filed a grievance complaining that the drug test was "harassment."  (Bryant Dep. at 160-61, 207; Ex. 8 to Bryant Dep.)

---

[10] Although Bryant's brief contends that they did not take her to the medical center, she clearly testified in her deposition that the security guard escorted her to the medical center that night for the drug test.  (Bryant Dep. at 161.)

### E.  November 3, 2007 Accident

On November 3, 2007, Bryant slipped in mud and fell on her right hip while crossing the railroad tracks at the plant, and she was transported to Princeton Hospital by USS ambulance.  (Bryant Dep. at 171, 189-92.)  When she reached the hospital, Bryant complained of pain in her right hip and stated that it "felt like something tearing and popping."  (Ex. 1 to Szabo Dep.)  Dr. Angelyn Ramsey, a physician at Princeton, examined Bryant.  (Id.)  Although Bryant "exhibited extreme distress and was tearful and anxious," the physical examination "revealed no redness, no deformity, stable joints, no visible bruising, and no swelling."  (Ex. 19 to Bryant Dep. at ¶ 29.)  Dr. Ramsey administered morphine and ordered an x-ray of Bryant's hip, pelvis and coccyx region.  (Exs. 1&4 to Szabo Dep.)  The x-rays were normal.  (Id.)

After receiving the results of the x-ray, Dr. Ramsey discharge Bryant with a prescription for pain medication.  (Ex. 19 to Bryant Dep. at 8.)  Bryant, however, refused to leave the hospital because she believed she was misdiagnosed, stating that she was in extreme pain.  (Id.)  Dr. Ramsey called Dr. Szabo regarding the situation and informed her that she had administered morphine and taken x-rays of her hip that were negative.  (Id.)  During this consultation, it was decided that Bryant should undergo an MRI.  (Borman Decl. ¶ 16.)  Dr. Szabo authorized the MRI and also authorized any additionally necessary diagnostic tests.  (Szabo Dep. at 54.)  Bryant

underwent the MRI,[11] and the results did not show any abnormalities or anything that would cause pain.  (Bryant Dep. at 292, Exs. 1&4 to Szabo Dep.)  Dr. Ramsey diagnosed Bryant with a right hip contusion[12]  and prescribed medication for pain. (Ex. 4 to Szabo Dep.)  Bryant was also provided crutches by the hospital upon discharge.  (Id.)  The next day, Sunday, November 4, 2007, Bryant returned to USS, but was assigned sedentary work.  (Id.)

F.  The Accident Investigation and Aftermath

The day after Bryant's accident, November 4, 2007, Borman received a phone call from the Plant's General Manager that Bryant reported to work that day complaining about the treatment she received at Princeton Hospital and by Dr. Szabo. (Borman Dep. at 106-107, 112, 126-27.)  Borman interviewed[13] Bryant about her complaints in the presence of Coleman Kelly, Dwight Campbell, safety engineer,

_____

[11] Apparently this test took some time because Dr. Ramsey had to call radiology personnel from home to come to the hospital to perform the MRI because none were on duty at the time.  (Ex. 4 to Szabo Dep.)

[12] A "contusion" is defined as "[a]n injury in which the skin is not broken, often characterized by ruptured blood vessels and discolorations; a bruise."  American Heritage Medical Dictionary, 2007.  See also Mosby's Medical Dictionary, 8th ed., 2009 ("an injury that does not disrupt the integrity of the skin, caused by a blow to the body and characterized by swelling, discoloration, and pain. The immediate application of cold may limit the development of a contusion. Also called bruise.")

[13] This interview is an area of intense debate between the parties, and the evidence is muddled at best and uncomprehensible at worst.

USW Local 2122 President Bull Gunnin and Bryant's husband, Mark Bryant.  (Id. at 104-09, 133-34; Bryant Dep. at 197-98; Ex. 11 to Borman Dep.)

The meeting began with Borman informing Bryant that he was investigating her complaints regarding her care and Dr. Szabo and that he was going to write down what she told him.  (Ex. 19 to Bryant Dep.)   Bryant stated that she was in pain and that she should be at home. (Id.)  She continued by describing her fall, the arrival of the ambulance, and the administration of the morphine at the hospital.  (Id.)  The vast majority of the interview, however, centered around Bryant's treatment at the hospital.  Borman made a written record of the following three statements, allegedly made by Bryant during the interview:

   a.   Dr. Ramsey told her that Dr. Szabo "chewed out" Dr. Ramsey because she had administered pain medication without first consulting Dr. Szabo.

   b.   Dr. Ramsey told Plaintiff that Dr. Szabo directed her to send Plaintiff back to work; and

   c.   Dr. Ramsey told Plaintiff that the hospital has a contract with U.S. Steel and, consequently, the hospital has to follow Dr. Szabo's orders.

(Borman Dep. at 100-01; Ex. 11 to Borman Dep.)

Borman read these statements back to Bryant, and, according to Borman, Bryant said that one of the statements was not correct.  (Id.; Ex. 19 to Bryant Dep.)

15

Bryant allegedly changed the second statement to say that Dr. Szabo directed Dr. Ramsey to return Bryant to the Plant before the x-rays had been taken.  (Id.)

The problem with these statements, transcribed by Borman, is that Bryant denies making them.  (Bryant Dep. at 225.)  Bryant does not deny that Borman transcribed these statements during the interview, and that they discussed these statements during the interview.  (Id. at 224.)  She also does not deny that statements similar to the ones transcribed by Borman were made; instead she testified that her statements were taken out of context or that "different version[s] . . . were taken the wrong way."  (Id. at 232.)  Other individuals present at the meeting confirm Bryant's testimony regarding the statements by Borman - they were not Bryant's words, but they were Borman's understanding of what Bryant was telling him.  (Ex. 19 to Bryant Dep. at 14.)

The confusion around what was said during this meeting is understandable. The interview took place in the break room of the Slab-Conditioning building where Bryant worked.  (Ex. 19 to Bryant Dep. at 7.)  The room was small, and it was apparently loud in the building since the "Unit was a 24/7 operation."  (Id.)  To add to those issues, Bryant has hearing problems, and repeatedly stated throughout the interview that she was in pain and having trouble concentrating.  (Id. at 6.) Apparently Borman and Bryant often asked each other to repeat what the other had

16

said, or to clarify or confirm statements.  (Id. at 7.)  Because of the mass confusion

of the meeting, Bryant asked if she could submit a written statement about the events

surrounding the accident and her hospital visit.  (Ex. 11 to Borman Dep.)

At this pont, the meeting started winding down, and Borman believed the

meeting was over, but Bryant began to complain about being drug tested two months

earlier.  (Ex. 11 to Borman Dep; Ex. 19 to Bryant Dep.)  Bryant apparently believed

that Dr. Szabo had ordered the drug test and was very upset about it.  (Id.)  Borman

informed Bryant that Dr. Szabo had not ordered the test, and that USS had the right

to test her under the local union agreement.  (Ex. 19 to Bryant Dep.)

After the interview was over, the group went to the scene of the accident,

where there was a lot of mud and depressions in the mud, but it was impossible to tell

exactly what happened from visiting the scene.  (Id.)  At some point,[14] Union

President Gunnin told Borman that he wanted the situation with Bryant to be added

to the union's claims of malpractice and unethical conduct by Dr. Szabo.  (Id.; Ex. 11

to Borman Dep; Gunnin Decl.)

Later that day, Borman contacted Dr. Szabo at home and relayed what Bryant

had said.  (Ex. 19 to Bryant Dep.)  Dr. Szabo denied all of the allegations.  (Id.)

---

[14] USS contends that this conversation occurred after the interview, while Bryant
contends that it occurred before the interview.  The timing of the conversation is not material.

Borman next contacted Dr. Ramsey concerning Bryant's allegations. (Borman Dep. at 48, 52; Szabo Dep. at 55-56; Ex. 15 to Borman Dep.) Dr. Ramsey denied making any of the statements attributed to her by Bryant. (Id.; Attachment A to Ex. 17 to Bryant Dep.) She also stressed that she had never been admonished by Dr. Szabo, that she contacted Dr. Szabo after she received the results of the x-rays, and that she was never told that she was required to follow orders from Dr. Szabo. (Id.)

The next day, Monday, November 5, 2007, Bryant met with Dr. Szabo for a re-check and complained of "severe right hip pain" and was crying upon examination. (Id.) She stated that she could not put any weight on her right hip and insisted on being in a wheelchair. (Id.) To rule out the possibility of any hidden fractures in Bryant's hip, Dr. Szabo ordered a bone scan of her right hip. (Id.) The bone scan did not show any abnormalities. (Id.)

On November 12, 2007, a workers' compensation attorney who was representing Bryant contacted USS and requested that USS give Bryant a list of four orthopedic doctors to visit. (Szabo Dep. at 42-43; Ex. 2 to Szabo Dep.) One of the doctors on the list was Dr. John Featheringill, an orthopedic surgeon. (Id.) He examined Bryant on November 19, 2007 and did not find any evidence of bruising to Bryant's hip. (Ex. 3 to Szabo Dep.) Dr. Featheringill found mild tenderness in her right buttock with no pain on movement of her right hip. (Id.) He ordered x-rays of

18

Bryant's hip and the results were normal.  Dr. Featheringill diagnosed Bryant with a hip contusion.  (Id.)

### G.   Bryant's Suspension and Discharge

On November 8, 2001, USS suspended Bryant for five days subject to discharge for providing false testimony during an accident investigation.  (Bryant Dep. at 223; Ex. 12 to Bryant Dep.; Borman Dep. at 30, 48-50, 117.)  On November 19, 2007, a hearing was held with USS, Bryant and the USW according to the BLA to address Bryant's discipline.  (See Ex. 13 to Bryant Dep.)  The hearing was heated and centered on the statements allegedly made by Bryant.  (Id.)  Borman confronted Bryant about the statements and Dr. Ramsey's denials.  (Id. at 1.)  At first, Bryant denied that she made any of the statements (id. at. 2-3), but later admitted that she stated in the November 4 interview that "Dr. Szabo chewed Dr. Ramsey out because she administered pain medication to" Bryant.  (Id. at 3.)  She did not admit to making the other two statements transcribed by Borman, however.  (Id. at 3-11.)

Bryant also submitted the following written statement, in full, addressing the accident:

> On November 3 2007 I slipped and fell on the railroad tracks at the plant.  I was taken by Company ambulance to Princeton Hospital.  I was treated and released to Security w[h]ere I went back to Medical took my drug test which showed only the drugs they had administered and was

told to report for work the next day.  I was told there were no breaks or
fractures.

(Ex. 19 to Bryant Dep. at 4.)   Bryant's statement did not address any of the

controversies surrounding her alleged comments to Borman during the November 4

interview.  (See id.)

 After the hearing on November 19, 2007, USS converted Bryant's suspension

to a discharge.  (Bryant Dep. At 231; Ex. 15 to Bryant Dep.)  USS denied Bryant

Justice and Dignity, which allows for employees in certain situations to continue

working pending arbitration.   Per the union contract, the Grievance Procedure

continued to the Second and Third steps, with USS continuing to deny the grievances

filed by Bryant.

 *H. Arbitration Proceeding and Results*

 On March 3, 2008, Bryant appealed the denial of her grievance to arbitration.

(Bryant Dep. at 238.)  Her grievance was heard at arbitration on May 14, 2008.  (Id.

at 239; Ex. 19 to Bryant Dep. at 2.)  On July 11, 2008, the arbitrator reversed Bryant's

termination[15] and ordered her to be reinstated, contingent upon her being examined

and declared fit to return to work by a licensed psychiatrist or psychologist who was

---

[15] The arbitrator found that "[o]ur ultimate conclusion on the falsification charges against
Grievant is that the conflicting accounts of what occurred on November 3-5, 2007 do not provide
sufficient evidence of intentional wrongdoing to support a discharge."  (Ex. 19 to Bryant Dep. At
25.)

mutually agreeable to USS and the Union.  (Ex 19 to Bryant Dep. at 27; Thomas Dep.

at 17-18, 54.)  The arbitrator added this contingency because Bryant's "behavior in

general and her attitude toward Dr. Szabo in particular raise genuine questions about

her emotional stability if not some form of paranoia."  (Ex. 19 to Bryant Dep. at 27.)

USS suggested Dr. Adrian H. Thurstin as the doctor to examine Bryant, and the

Union agreed to have Dr. Thurstin conduct a fitness for duty examination.  (Pl. Ex.

J; Thurstin Dep. at 25.)

   *I. Examination by Dr. Thurstin*

   Bryant met with Dr. Thurstin on August 21, 2008.  (Pl. Ex. K; Ex. 25 to Bryant

Dep.)  Dr. Thurstin testified that he understood that the purpose of the evaluation was

"to look at her psychological status and determine her ability to continue functioning

in the [work] environment."  (Thurstin Dep. at 10.)  Dr. Thurstin did not specifically

address Bryant's fitness for duty, however.  (Id. at 15-16.)  Dr. Thurstin's report

concluded with the following summary:

> Ms. Bryant is an individual who will have difficulty consistently
> perceiving and understanding the perspective of other individuals.
> Consequently, interpersonal conflicts are likely to emerge as she is
> unable to consider alternative appraisal to her own.  Also, conflicts with
> others may be exaggerated and magnified as she interprets evens in an
> idiosyncratic manner.  With her current distress, her coping skills and
> abilities have been stretched to capacity with evidence that she is
> sinking into depressed mood with associated anxious affect.  In all
> likelihood, interpersonal problems will likely persist whenever she

engages or encounters stressful circumstances.  Given her life history,
she could well benefit from treatment for possible Post-Traumatic Stress
Disorder and underlying depression.

(Pl. Ex. K. at 4.)  Bryant received this report from Dr. Thurstin after her evaluation.

(Bryant Dep. at 270.)

After USS received a copy of Dr. Thurstin's report, it contacted Dr. Thurstin

because the report did not declare whether Bryant was fit to work.  (Thomas Dep. At

28.) Dr. Thurstin then amended his report to include the following paragraph, entitled

"Implications."  (Ex. 28 to Bryant Dep.)  The paragraph states as follows:

Variability in cognitive skills especially processing speed could impact
her capacity for safely working in situations requiring rapid response.
Interpersonal difficulties will likely contribute to creating a hostile work
environment.  Prior to resuming work-related duties, she would benefit
from treatment for interpersonal skill deficits, cognitive problems, and
presumed depressed mood.

(Id. at 4.) Bryant was given a second version of the report by a Union representative.

(Id.)

Subsequent to receiving Dr. Thurstin's amended report, on November 11,

2008, USS wrote a letter to Bryant, via the union, stating that although Dr. Thurstin

did not indicate Bryant was fit to work, he did "clearly state . . . that Ms. Bryant needs

treatment for interpersonal skill deficits, cognitive problems and presumed depressed

mood prior to returning to work-related duties.  Once she has been treated for those

issues, I suggest that we send her back to Dr. Thurstin for a follow-up evaluation."

(Ex. 5 to Thomas Dep.)

### J.  Other Psychologists and Release

Bryant testified that she was told by her union representative that if she got her psychologist to sign a paper saying that she was fit to work and gave it to USS, she would be returned to work.  (Bryant Dep. at 201.)  Bryant was examined by two psychologists of her own choosing, one of whom had been treating her since March 2008.  (Bryant Dep. at 254, 256; Exs. 26-27 to Bryant Dep.)  Both psychologists declared her fit to work.  (Id.)

Bryant gave the two psychologists's opinions to her union representative and believed that she would be returned to work. (Bryant Dep. at 202.)   She was not, however, and instead, USS requested that she sign a release.  (Id.)  USS maintains that the release was for medical documentation so that it could give her psychologists's reports to Dr. Thurstin so he could review them and make a determination whether Bryant had met the requirements and was fit to return to work. (Thomas Dep. at. 40-41.)  Bryant maintains, however, that the release was more than a mere medical release, but also a financial information release.  (Bryant Dep. at 202-03.) She refused to sign the release, has not been declared fit to work by Dr. Thurstin, and has not been reinstated.  (Id. at 245, 267-68.)

23

## IV.  Analysis

Plaintiff's Complaint contains the following five counts: (1) Count I alleges sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et. seq., claiming (a) that she was discharged because of her sex, (b) that USS failed to accommodate her medical condition because of her sex, and (c) that she was subjected to sexual harassment; (2) Count II alleges retaliation because of her sex and race in violation of Title VII regarding (a) a drug test she was required to take, (b) her discharge, and (c) the refusal of USS to return her to work; (3) Count III asserts the same retaliation claims because of her race in violation of 42 U.S.C. § 1981; (4) Count IV alleges race discrimination in violation of section 1981 (a) in her discharge and (b) in USS's failure to accommodate her medical condition; (5) Count V alleges a violation of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et. seq., in USS's refusal to return her to work.   In her opposition brief (doc. #30), Plaintiff drops her claims of sexual harassment contained in Count I (id. at 44) and her claims that USS discriminated against her because of her sex (Count I) and race (Count IV) when it failed to provide her an accommodation. The court addresses Plaintiff's remaining claims separately below.

24

A.    *Bryant's Claims Under Title VII (Counts I & II) and ADA (Count V) are Time- Barred.*

Both Title VII and the ADA require, as a condition precedent, that once the EEOC notifies an aggrieved party that it is terminating action on a charge, a plaintiff must file suit no later than 90 days after receiving such notice.  See 42 U.S.C. § 2000e-5(f)(1); 42 U.S.C. § 12117(a). To determine when the 90-day statutory limitation period begins to run, the Eleventh Circuit has adopted a case-by-case approach and has generally held that "[t]he key word in the statute is 'notify;' the limitations period begins to run upon notification of the aggrieved party."  Franks v. Bowman Transp. Co., 495 F.2d 398, 404 (5th Cir. 1974), rev'd on other grounds, 424 U.S. 747 (1976).  Because the statute did not intend to "condition a claimant's right to sue under Title VII on fortuitous circumstances or events beyond his control," notification is complete "only upon actual receipt of the letter."  Franks, 495 F.2d at 404.  Thus, generally, the 90-day period begins to run once the EEOC notification letter has been received by the plaintiff.  See id.

If the defendant doubts that plaintiff has fulfilled her conditions precedent in whole or in part, and "the defendant contests this issue, the plaintiff has the burden of establishing that [s]he met the ninety day filing requirement."  Green v. Union Foundry, Co., 281 F.3d 1229, 1234 (11th Cir. 2002) (citing Jackson v. Seaboard

25

Coast Line R.R. Co., 678 F.2d 992, 1010 (11th Cir. 1982)); see also Santini v. Cleveland Clinic Fla., 232 F.3d 823, 825 (11th Cir. 2000). In Green v. Union Foundry Co.,, the Eleventh Circuit held the district court properly granted the defendant's summary judgment where the plaintiff filed his complaint ninety-seven days after the EEOC mailed his right to sue letter and where the plaintiff presented no evidence of his date of receipt. 281 F.3d at 1234. Similarly, in Martinez v. United States Sugar Corp., the district court granted summary judgment to the defendant when the plaintiff could not remember receiving the right to sue letter and filed suit ninety-five days after the EEOC mailed the letter. 880 F. Supp. 773, 777 (M.D. Fla. 1995), aff'd 77 F.3d 497 (11th Cir. 1996).

Here, USS contends that Bryant's claims under Title VII (Counts I and II) and her claims under the ADA (Count V) are time barred because she did not file suit against USS within ninety (90) days of receiving her right to sue letter. Specifically, the notice of right to sue letter was dated November 25, 2008 (Ex. 10 to Bryant Dep.), and Bryant did not file suit until March 2, 2009, 97 days after the EEOC mailed the notice of right to sue to Bryant. Bryant did not present any admissible evidence[16] that

---

[16] The court granted the motion to strike Plaintiff's declaration, in which she stated she remembered receiving her notice on a date certain, which was within the 90-day period, as it contradicted her earlier, sworn deposition testimony. (Doc. #39.) The court also denied Plaintiff's motion to reconsider. (Doc. #41.)

26

she did file within the 90 day requirement period.  In her deposition Bryant testified that she could not remember when she received her right to sue letter.  (Bryant Dep. at 181-82.)  Therefore, on this ground alone, the court finds ample reason to grant summary judgment on Bryant's claims under Title VII and the ADA to USS - Bryant failed to commence this action within the statutorily proscribed time.  See Martinez, 880 F. Supp. 773, 777 (M.D. Fla. 1995), aff'd 77 F.3d 497 (11th Cir. 1996) (summary judgment for defendant affirmed where  plaintiff could not remember receiving the right to sue letter and filed suit ninety-five days after the EEOC mailed the letter).

> B.  *Bryant's Claim of Race Discrimination Under Section 1981 (Count IV) Fails as a Matter of Law.*

Bryant contends that USS discriminated against her based on her race when it discharged her in November 2007, in violation of 42 U.S.C. § 1981.[17]  (Compl. ¶¶ 40-49.)  Section 1981 prohibits employers from discriminating against employees because of their race.  In the Eleventh Circuit, § 1981 race discrimination claims are analyzed using the same framework as Title VII claims.  See Hudson v. Mr. Burch Formal Wear, Inc., 193 Fed. Appx. 859, 2006 WL 2351837, No. 05-16269, at *1 (11th Cir. Aug. 15, 2006) (citing Cooper v. Southern Co., 390 F.3d 695, 724-25 (11th

---

[17] Bryant's complaint also alleges race discrimination in violation of § 1981 in USS's failure to accommodate her medical condition.  Bryant's brief does not discuss this claim, and the court deems it abandoned.  See United States v. Jernigan, 341 F.3d 1273, 1284 n.8 (11th Cir. 2003).

Cir. 2004)); see also Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 843

n. 11 (11th Cir. 2000) and Cross v. Alabama, 49 F.3d 1490, 1507-08 (11th Cir. 1995).

Thus, to succeed on a § 1981 race claim, the plaintiff bears the burden of producing

a prima facie case of discrimination.  Holifield v. Reno, 115 F.3d 1555, 1561 (11th

Cir. 1997).   A plaintiff may discharge his burden by offering "direct evidence,

circumstantial evidence or statistical evidence."   Standard v. A.B.E.L. Servs., Inc.,

161 F.3d 1318, 1330 (11th Cir. 1998).

Since Bryant proceeds herein using only circumstantial evidence, she must

show as an initial matter that: (1) she was a member of a protected class; (2) she was

qualified for the job from which she was discharged; (3) she was discharged; and (4)

she was replaced by a person outside her protected class or was treated less favorably

than a similarly situated individual outside her protected class.  See Maynard v. Bd.

of Regents of Div. of Univ. of Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir.

2003).  Employees are similarly situated when they are accused of the same or similar

conduct. Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001).

The conduct must be nearly identical "to prevent courts from second-guessing

employers' reasonable decisions and confusing apples with oranges."  Id. (citations

omitted) (holding that although two employees had arrests for assaulting a child, they

were not similarly situated because one had three additional arrests for violent assaults).

If Bryant produces sufficient evidence to establish the prima facie case, the burden shifts to USS to articulate a legitimate, non-discriminatory reason for the adverse employment action. See Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 767 (11th Cir. 2005); see also Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642-43 (11th Cir. 1998). Upon articulation, the burden shifts back to Bryant to prove that the articulated reason was as a pretext for discrimination. See id. at 643; see also McDonnell Douglas v. Green, 411 U.S. 792, 802-03 (1973). Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case. See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed

29

motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000);[18] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

USS contends that Bryant cannot establish a prima facie case of race discrimination with regard to her discharge. Although USS concedes that Bryant meets the first three prongs of her prima facie case, USS argues that Bryant's prima facie case fails because "she has no comparator evidence showing that similarly

---

[18] The court in Chapman modified the statement in Combs contrary to this holding in Reeves after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law. See Chapman, 229 F.3d at 1025, n.11.

situated black . . . employees were treated differently."[19]   (Doc. # 26 at 23.)  The court

agrees.

In her opposition brief, Bryant makes a half-hearted attempt to establish this

final prong of her prima facie case.  (Doc. # 30 at 37-39.)  Interestingly, Bryant's

argument  focuses almost exclusively on <u>sex</u>, as opposed to race, and the vast

majority of her argument is taken word-for-word from her argument on sex

discrimination.[20]   (Compare <u>id.</u> at 35-37 to 37-39.)  It is not the job of the court to

---

[19] In a termination case like the one here, the plaintiff does not necessarily have to
establish the existence of similarly situated comparators.  "A prima facie case of discrimination
in termination is established where the plaintiff proves by a preponderance of the evidence that
he or she is a member of a protected class, was qualified for the position held, and was
discharged and replaced by a person outside of the protected class <u>or</u> was discharged while a
person outside of the class with equal or lesser qualifications was retained."  <u>Walker v. Mortham</u>,
158 F.3d 1177, 1187 n.21 (11th Cir. 1998) (emphasis in original) (citing <u>Lee v. Russell County
Bd. of Educ.</u>, 684 F.2d 769, 773 (11th Cir.1982)).  The disjunctive nature of the prima facie
standard has been overlooked by many courts, and many other cases in the Eleventh Circuit, for
whatever reason and has caused much confusion in the precedent.  <u>See Walker</u>, 158 F.3d at 1187
n.21.  However, the earliest cases which articulate the prima facie elements in termination cases
do not support an element of relative qualifications <u>if</u> the employer has filled the plaintiff's
position with a person outside the plaintiff's protected class.  <u>See Lee</u>, 684 F.2d at 773; <u>Jackson
v. City of Killeen</u>, 654 F.2d 1181, 1183-84 & n.3 (5th Cir. 1981); <u>Rhode v. K.O. Steel Castings,
Inc.</u>, 649 F.2d 317, 322 (5th Cir. 1981).

Because the court is bound to follow the "earliest case rule," <u>see Walker</u>, 158 F.3d at
1188-89, the court ordinarily would not require Bryant to establish the similarly situated element
in this termination case.  That being said, however, Bryant has not presented any evidence
whatsoever of who filled her position, and what the race of that individual is.  Without this
evidence, Bryant has similarly failed to present a prima facie case of race discrimination in her
termination under this alternative articulation.

[20] For instance, Bryant's brief states she is a member of a protected class under § 1981
because she is female.  (Doc. #30 at 38.)  The court disregards this obvious error, but highlights
the lack of attention paid to the claim by Plaintiff's brief.

scour the record and develop an argument for Plaintiff regarding any alleged race discrimination in her discharge, nor is it the court's responsibility to find a comparator among the record, and the court refuses to do so here, especially in light of the lack of effort on the part of Plaintiff.

That being said, Plaintiff makes the following attempt to identify a comparator:[21]

> Now, Betty Bryant was fired for allegedly conspiring with the Union to provided false testimony during an investigation for the purpose of getting Dr. Szabo. . . . Several male employees filed a grievance and complaint against Dr. Szabo through the union. The more than 40 complaints filed by male employees was the conspiracy that the defendant claim Betty Bryant joined to help the Union get rid of Dr. Szabo. While Betty Bryant was interviewed during the investigation to determine what statement she actually made regarding Dr. Szabo, the male employees were not interviewed during the investigation to determine their part in the alleged conspiracy by the company. According to the defendant, it determined that Betty Bryant and some black male employees made false statement against Dr. Szabo. While Betty Bryant was terminated for allegedly making false statement as part of a conspiracy to get rid of Dr. Szabo, the black male employees have received no discipline for making false statement during allegedly the same conspiracy. The problem is that Betty Bryant never filed a claim with the Union against Dr. Szabo[.]

> The defendant claims that since the union filed the complaint with the company. It cannot say that the male employees actually made the statement in the summary produce by the defendant in this case. The problem with the defendant's argument is that William Gunnin has stated that he provided the complaints to the company, and that each

---

[21] The argument also seems to attempt to address the issue of pretext.

complaint was signed by the union member who was making the
allegation. Therefore, there was no doubt that the employee not the
union was making the allegations against Dr. Szabo.

(Id. at 38-39.)

The court cannot make heads or tails of the above argument when it comes to
the issue of identifying a suitable comparator for Bryant's claim of race
discrimination. She seems to point to the individuals who signed the grievances that
were submitted to USS by the Union, but makes no attempt to establish how the
employees who signed these grievances are appropriate comparators. Although she
states that USS "determined that Betty Bryant and some black male employees made
false statement against Dr. Szabo," there is no citation to the record, and no way for
the court to determine if these "black males" are suitable comparators.[22]
Additionally, there were also white employees included in the Union's list of
individuals with grievances against Dr. Szabo. The inclusion of white employees
with the black employees who were not disciplined as a result of USS's investigation
of those claims clearly undermines any chance of those employees being suitable
comparators.

_____

[22] Moreover, even if the court had this basic comparator information, the situation with
the grievances submitted by the Union to USS is not similar to the situation that led to Bryant's
discharge. In the former situation, USS did not conclude that any individual made any particular
false statements. Instead, USS concluded that the allegations against Dr. Szabo were false,
generally.

Bryant's failure to identify a suitable comparator does not end the analysis of her termination claim, however.  "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  Holifield, 115 F.3d at 1562 (citing Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 182 (1st Cir. 1989); Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1092 (11th Cir. 2004).  As is evidenced from the above recitation of Plaintiff's lackluster argument regarding her claim of race discrimination, Plaintiff failed to present any evidence of race discrimination with regard to her discharge.  Her argument focuses mainly on her sex, a claim that the court has already concluded was untimely.  What is left is an attempt to throw up a bunch of arguments in the hope that one sticks - and that attempt clearly fails.  There is simply no evidence from which a reasonable jury could conclude that Bryant was discriminated against because of her race, white, when USS discharged her.[23]

C.    Bryant's Claims of Retaliation Under Section 1981 (Count III) Fail as a Matter of Law.

Bryant contends that USS retaliated against her because of her race, in violation of section 1981, in the following three ways: (1) when USS drug tested her;

_____

[23] Even if Bryant could establish a prima facie case of discrimination with respect to her termination, she cannot establish pretext for the same reasons discussed above.

(2) when USS discharged her; and (3) when USS failed to reinstate her.   The Eleventh Circuit applies the McDonnell Douglas framework, discussed in detail above, when analyzing claims of retaliation brought under § 1981. See Baker v. Russell Corp., Slip Copy, 2010 WL 1434404, No. 09-14930 at *2 (11th Cir. April 12, 2010) (citing Bryant v. Jones, 575 F.3d 1281, 1307 (11th Cir. 2009), cert. denied, __ S. Ct. __ (U.S. Feb. 22, 2010)).  A prima facie case of retaliation is established when the plaintiff demonstrates: (1) that she engaged in statutorily protected activity; (2) that an adverse employment action occurred; and (3) that the adverse action was causally related to her protected activities.  See Farley v. Nationwide Mutual Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999); see also Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that Title VII and § 1981 have the same requirements of proof and use the same analytical framework) and Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002) (noting that courts properly apply cases from Title VII and § 1981 interchangeably).  In the context of a retaliation claim, adverse actions are those that constitute a "serious and material change" in the terms and conditions of employment, Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239, or that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. and Santa Fe Ry. Co. v. White,

35

548 U.S. 53, 57 (2006); <u>accord</u> <u>Crawford v. Carroll</u>, 529 F.3d 961, 974 (11th Cir. 2008).

Further, just as in the discrimination context, after the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability. <u>Coutu v. Martin County Bd. of County Comm'rs</u>, 47 F.3d 1068, 1073, 1075 n. 54 (11th Cir.1995). The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct. <u>Id.</u>

USS contends that Bryant's prima facie case fails with respect to all three allegations of retaliation because Bryant did not engage in protected conduct. Even if she engaged in protected conduct, however, USS argues that she cannot establish the other elements of a prima facie case with regard to her allegations, and, if she could, she has failed to establish pretext. The court addresses each contention separately below.

1.      Bryant Engaged in Statutorily Protected Activity.

As explained above, to state a retaliation claim under § 1981, a plaintiff must allege a defendant retaliated against him because the plaintiff engaged in statutorily

36

protected activity. Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008). As with other statutory retaliation claims, such a claim under § 1981 requires that the protected activity involve the assertion of rights encompassed by the statute. See Hawkins v. 1115 Legal Svc. Care, 163 F.3d 684, 693 (2d Cir. 1998); see also Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004) (stating to establish a retaliation claim under Title VII, the retaliation must be in response to a "statutorily protected activity"); Wascura v. City of S. Miami, 257 F.3d 1238, 1247 (11th Cir. 2001) (holding to establish a retaliation claim under the FMLA, the employee must first engage in an activity protected by the FMLA).

Bryant points to three different activities as statutorily protected: (1) her participation in William Jackson's contest of the results of the union election; (2) her participation in Dubose and Godwin's discrimination suits against USS; and (3) the filing of her EEOC charge. As to her first activity, Bryant did not engage in protected activity in her involvement with William Jackson's contest of the union results for grievance chairman. The primary reason for this conclusion is that Bryant's participation in this internal investigation and resulting lawsuit was against the union -- it was not against her employer, USS. To be protected activity, Bryant must show that she "subjectively (that is, in good faith) believed that h[er] employer was engaged in unlawful employment practices," and that her "belief was objectively reasonable

37

in light of the facts and record presented." Little v. United Tech. Carrier Transicold

Div., 103 F.3d 956, 960 (11th Cir. 1997) (emphasis added). Complaining about and

testifying in an investigation  and lawsuit about potential race discrimination on the

part of the union is not protected activity under § 1981.[24]

Bryant did, however, engage in protected activity when she aided in Dubose

and Godwin's lawsuits asserting race discrimination against USS.  Both Dubose and

Godwin filed complaints alleging race discrimination against USS in May and June

2007, respectively.   (Bryant Dep. at 172; 2:07-cv-862-VEH; 2:07-cv-1411-SLB.)

Bryant testified that she provided information to both men's attorneys, although she

never testified on their behalf.  (Bryant Dep. at 156-57, 173-74, 281, 311.)  This

participation, however slight, is sufficient activity to be protected by § 1981.[25]

Ordinarily, Bryant would have engaged in protected activity when she filed her

EEOC  charge  on  January  29,  2008.[26]   "[T]o  be  actionable  under  § 1981,  the

---

[24] Bryant's testimony that "a person from the company" told her that she would be fired if
she aligned herself with Jackson does not change the court's analysis. The alleged comment does
not somehow turn Jackson's allegations of race discrimination against the union into allegations
that USS discriminated against him. Moreover, the court has no idea who the "person from the
company"was or what his or her position was within the company.

[25] Although USS argues that it did not know of her involvement in those lawsuit, Bryant's
name did come up during the depositions of both Dubose and Godwin, and Dubose testified that
Bryant had given him evidence to support his case.  (Ex. 18 to Borman Dep. at 283-84 and Ex.19
to Borman Dep. at 210-11, 222-23.)

[26] Clearly, this statutorily protected activity relates only to the failure to reinstate Bryant
as it occurred after the other alleged acts of retaliation.  See EEOC v. Total Sys. Servs., Inc., 221

retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981." See Hawkins , 163 F.3d at 693. "An act for retaliation for engaging in activity protected by Title VII does not give rise to a claim for retaliation that is cognizable under § 1981 unless that activity was also protected by § 1981." Id. Plaintiff's EEOC charge does not refer to discrimination on the basis of race. The EEOC charge alleges discrimination on the basis of sex and disability only, not race.[27]  (See doc. #13.)  Simply put, Section 1981 does not provide protection for Bryant's assertion of her rights regarding alleged sex and disability discrimination. Therefore, any retaliation against plaintiff for the filing of Bryant's EEOC charge is not actionable under Section 1981.

> 2.  Bryant Cannot Establish that the September 2007 Drug Test Was an Adverse Employment Action.

USS contends that Bryant cannot establish the second and third elements of her prima facie case of retaliation when it comes to the drug test in September 2007. First, USS argues that the drug test was not an adverse employment action because she was not harmed or disciplined as result of the drug test.  As stated above, however, all Bryant has to show is that the actions taken by USS "well might have

---

F.3d 1171, 1174 (11th Cir. 2000) (claim for retaliation for activities which occur in connection with or after the filing of a formal charge of discrimination with the EEOC).

[27] The EEOC charge does check "retaliation," but it is clear from the description this alleged retaliation relates to gender and disability.  (See doc. #13.)

dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. and Santa Fe Ry. Co.</u>, 548 U.S. at 57.

Bryant's argument falls short of even <u>Burlington</u>'s low standard. Bryant complaints surrounding the drug test are not that it was administered; instead, Bryant testified that she was upset that a male security guard escorted her to the testing sight at night. (<u>Id.</u> at 161, 286-87.) Bryant testified that her discomfort and anger with having one male guard escort her stemmed from the fact that she was raped when she was fifteen. (<u>Id.</u> at 163; Compl. ¶ 26.) Bryant admits that normal procedure was followed, and it is undisputed that Bryant worked during 11:00 p.m. to 7:00 a.m. shift on September 18, 2007. (<u>Id.</u> at 161, 286-87.) All of these facts lead to one conclusion: a reasonable person would not have been dissuaded from making or supporting a charge of discrimination because of this drug test. <u>See</u> <u>Burlington N. and Santa Fe Ry. Co.</u>, 548 U.S. at 57. Although Bryant was upset that a male security guard escorting her to the testing sight at night, it was because of a past act of violence against Bryant personally. This does not equate to the reasonable person standard. As such, the drug test is not sufficiently adverse under <u>Burlington</u>, and Bryant's prima facie case fails. Therefore, summary judgment is due to be granted to USS on Bryant's claim of retaliation under § 1981 for the drug test in September 2007.

3.     Bryant Failed to Establish that USS Terminated Her in Retaliation
for Conduct Protected Under Section 1981.

USS contends that Bryant failed to establish a prima facie case of retaliation in regard to her discharge. As discussed above, Bryant engaged in protected activity, and it is undisputed that her discharge is clearly an adverse employment action. USS maintains, however, that Bryant cannot establish a causal connection between her protected activity and her discharge. The court disagrees.

To establish a causal connection, a plaintiff must show that the decision-maker was aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated. See Farley, 197 F.3d at 1337. The causal link element is generally construed broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). Thus, a "close temporal proximity" between the plaintiff's protected conduct and an adverse employment action generally is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case. See id.; see also Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001); see also Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999). Moreover, the Supreme Court has warned that "mere temporal proximity between an employer's knowledge of protected activity and

41

an adverse employment action . . . must be 'very close.'" <u>Clark County Sch. Dist. v.</u> <u>Breeden</u>, 532 U.S. 268, 273 (2001) (citations omitted).

To establish this final prong of her prima facie case, Bryant argues that she was discharged after USS learned of her involvement with Dubose and Godwin's lawsuits.  This evidence is sufficient to establish " that the protected activity and the negative employment action are not completely unrelated." <u>Olmstead,</u> 141 F.3d at 1460.  Bryant's suspension was converted to a discharged on November 19, 2007. (Bryant Dep. at 231; Ex. 15 to Bryant Dep.)  Although the evidence is anything but clear as to when Bryant's protected activity occurred, she testified that she gave information to Dubose and Godwin in support of their race claims against USS and that USS learned of her involvement during depositions in those cases.  The lawsuits were filed against USS in April and May 2007.  Godwin's deposition was taken January 28, 2008, after Bryant's discharge.  (Ex. 19 to Borman Dep. at 1.)  Dubose's deposition, however, was taken on November 7, 2007, just twelve days before Bryant's discharge.  (Ex. 18 to Borman Dep. at 1.)  This short duration in time is clearly sufficient to establish a "close temporal proximity" between USS's learning of her protected activity and her discharge.  The Eleventh Circuit has stated that a "three to four month disparity between the statutorily protected expression and the adverse employment action is not enough" <u>Thomas v. Cooper Lighting, Inc.</u>, 506

42

F.3d 1361, 1364 (11th Cir. 2007); Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir.

2006), but a seven-week gap is sufficiently close to establish a causal connection.

Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) (ADA

case).  Clearly, twelve days suffices.

      USS articulated a legitimate, nonretaliatory reason for Bryant's discharge --

namely that Bryant lied during the accident investigation.  As evidence of pretext,

Bryant maintains that she did not make the statements alleged by Borman and that the

arbitrator found that she did not make those statements.  She, therefore, contends that

the reason articulated by USS is false.  (Doc. # 30 at 43-44.)  This argument fails.  It

is undisputed that Borman believed that Bryant  made the statements to him during

the interview on November 4, 2007.  (Borman Dep. at 100-01; Bryant Dep. at 224-25;

232.)  It is also undisputed that those alleged statements were false.  Bryant has

produced no evidence to challenge this good faith belief of Borman.  See  Elrod v.

Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that inquiry is

not whether employee was guilty of misconduct but whether employer in good faith

believed employee had done wrong and whether this belief was the reason for the

termination); Hawkins v. Ceco Corp., 883 F.2d 977, 980 n. 2 (11th Cir. 1989), cert.

den., 495 U.S. 935 (1990) (That the employee did not in fact engage in misconduct

reported to the employer is irrelevant to the question whether the employer believed

the employee had done wrong.).  Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the [Section 1981] does not interfere."  Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted). See also Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981.").

Bryant has offered no evidence to show that USS's reason is unworthy of credence.  Although she argues in her brief that the arbitrator "agreed that she had not made any false allegations," this statement is misleading.  While it is true that the arbitrator did find that Bryant did not intentionally lie to Borman during the interview, he did not find that Borman somehow concocted the statements out of thin air.  (See Ex. 19 to Bryant Dep. at 25-27.)  Bryant may have convinced the arbitrator that the allegations against her were untrue, but she certainly did not present any evidence that USS's asserted belief in those allegations was unworthy of credence.

In sum, Bryant has not offered any substantially probative evidence that her protected activity, supplying information to Dubose in furtherance of his race

44

discrimination suit against USS, more likely than not motivated her discharge.

"Conclusory allegations of [retaliation], without more, are not sufficient to raise an

inference of pretext or intentional [retaliation] where [an employer] has offered . . .

extensive evidence of legitimate, non-[retaliatory] reasons for its action." Carter v.

City of Miami, 870 F.2d 578, 585 (11th Cir. 1989) (citation omitted).  Because Bryant

has presented insufficient evidence that the nonretaliatory reason is unworthy of

credence or that her protected activity more likely than not was a motivating factor,

summary judgment is due to be granted in favor of USS on Bryant's claim of

retaliation under § 1981 regarding her discharge.

> 4.   Bryant Failed to Establish a Prima Facie Case of Race
> Discrimination Regarding USS's Failure to Reinstate Her.

Bryant cannot establish a prima facie case of retaliation when it comes to her

denial of reinstatement because she did not establish a causal connection between her

protected activity and USS's failure to reinstate her.  As discussed in detail above, to

establish a causal connection, a plaintiff must show that the decision-maker was

aware of the protected conduct and that the protected activity and the adverse action

were not wholly unrelated.  See Farley, 197 F.3d at 1337.  Bryant cannot do so here.

The arbitrator's decision is dated July 11, 2008 and Dr. Thurstin's initial assessment

report of Bryant was issued in late August 2008.  USS learned of Bryant's

participation in Dubose's lawsuit in November 2007 and in Godwin's lawsuit on January 28, 2008. The six month gap between USS learning of her protected activity and her failure to be reinstated is too great to establish the requisite temporal proximity. See <u>Thomas</u>, 506 F.3d at 1364 (a "three to four month disparity between the statutorily protected expression and the adverse employment action is not enough); <u>Drago</u>, 453 F.3d at 1308 (three months between a protected activity and an adverse employment action standing alone was insufficient to establish a causal connection of retaliatory discharge). As such, Bryant failed to establish a prima facie case of retaliation under § 1981 as it relates to her reinstatement, and summary judgment is due to be granted in favor of USS for this reason alone.

Even if Bryant could establish a prima facie case of retaliation, USS articulated a legitimate, nonretaliatory reason for not reinstating Bryant: she has not been declared fit to work as required by the arbitration decision. Under the arbitration decision, Bryant's reinstatement is contingent upon her being declared fit to work by a licensed psychiatrist or psychologist who is mutually agreeable to the union and USS. The union and USS agreed upon Dr. Thurstin, and it is undisputed that he has not declared Bryant fit to work.

As evidence of pretext, Bryant argues that because she underwent treatment, as suggested by Dr. Thurstin, she should be "put back to work." (Doc. #30 at 44.)

In essence, Bryant contends that USS's reasons for not reinstating her is unworthy of credence.  Her argument, however, fails.  Although it is true that Dr. Thurstin suggested that she receive treatment for certain conditions, USS never agreed to reinstate Bryant if she merely received treatment.  Instead, USS insists that under the arbitrator's award, Bryant had to be deemed fit to work by Dr. Thurstin, the doctor both the union and USS agreed to.  It is undisputed that has not occurred.  "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient" to establish pretext.  Chapman, 229 F.3d at 1030.  Therefore, Bryant's claim of retaliation in USS's failure to reinstate her fails as a matter of law.

## VI.  Conclusion

In summary, the court finds that no material issues of fact remain and that Defendant United States Steel Corporation is entitled to judgment as a matter of law as to all claims asserted by Plaintiff.  A separate order will be entered.

**DONE** this the ____21st____ day of June, 2010.

_James H. Hancock_

SENIOR UNITED STATES DISTRICT JUDGE